JCIKLORS

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

        v.                        14 CR 652 (PGG)

EFRAIN LORA,

           Defendant.

------------------------------x

                            New York, N.Y.
                            December 18, 2019
                            10:19 a.m.

Before:

                HON. PAUL G. GARDEPHE,

                            District Judge

                   APPEARANCES

GEOFFREY S. BERMAN,
    United States Attorney for the
    Southern District of New York
MAX NICHOLAS
    Assistant United States Attorney

JEFFREY G. PITTELL
    Attorney for Defendant


ALSO PRESENT:

STEVEN BERGER, NYPD Cold Case Squad
SPECIAL AGENT STEFANO BRACCINI
NATHAN RHODES, Spanish Interpreter
PABLO DONATTI, Spanish Interpreter

JCIKLORS

```
 1              (Case called)
 2              THE DEPUTY CLERK:  Is the government ready?
 3              MR. NICHOLAS:  Yes.
 4              Good morning, your Honor.  Max Nicholas, for the
 5    government.  Seated to my right are Detective Steven Berger and
 6    Special Agent Stefano Braccini, both who worked on the
 7    investigation.
 8              THE DEPUTY CLERK:  Is the defendant ready?
 9              MR. PITTELL:  Yes, your Honor.
10              Jeffrey Pittell, appearing with Mr. Lora.
11              THE COURT:  This matter is on my calendar for purposes
12    of sentencing.  In preparation for sentencing, I have read the
13    revised presentence report, which is dated December 4th, 2019.
14    I've read letters, dated December 13th and December 16th, 2019,
15    from the government, and I've read a letter from the defendant,
16    dated December 13th, and I've also read the exhibits attached
17    to that letter.
18              Mr. Pittell, have you read the revised presentence
19    report, its recommendation, and discussed it with Mr. Lora?
20              MR. PITTELL:  Yes to all your questions.
21              THE COURT:  And, Mr. Lora, has the presentence report
22    been read to you in Spanish, and have you discussed it with
23    Mr. Pittell?
24              THE INTERPRETER:  "Yes."  The defendant responded in
25    English.
```

JCIKLORS

1          THE COURT:  The defense has objected to both factual

2     portions of the presentence report as well as the guidelines

3     calculations reflected in the presentence report.  I'm going to

4     address those objections now.  They're set forth in the defense

5     submission, which is Docket No. 204.

6          The background is that Mr. Lora was convicted at trial

7     of a (b)(1)(A) violation of 21, United States Code, Section

8     846, a narcotics conspiracy, which was Count Three of the

9     applicable indictment.  He was also convicted of aiding and

10    abetting the discharge of a firearm in connection with that

11    drug conspiracy, a discharge that resulted in the death of

12    another person, in violation of 18, United States Code, Section

13    924(j).  That was Count One.

14         And, finally, he was convicted of causing the

15    intentional killing of Andrew Balcarran B-a-l-c-a-r-r-a-n in

16    connection with a drug conspiracy, in violation of 21, United

17    States Code, Section 848(e)(1)(A).  That was Count Two.

18         In an August 10, 2019 order, I vacated the jury's

19    finding -- findings as to drug quantity, finding that the

20    government had not proven (b)(1)(A) quantities beyond a

21    reasonable doubt.

22         As a result, I vacated the defendant's conviction on

23    Count Two because the government had not proven that the

24    underlying drug conspiracy involved (b)(1)(A) quantities of

25    drugs, which is a requirement for a Section 848(e) conviction.

JCIKLORS

1          Mr. Lora's convictions were otherwise upheld, citing

2     Docket No. 190.

3          On September 3rd, 2019, Mr. Lora moved for leave to

4     file a motion for a judgment of acquittal on Count One, the

5     Section 924(j) count, arguing that the evidence was

6     insufficient to sustain his conviction on that count.  I denied

7     that motion in a November 4, 2019 order, Docket No. 196.

8          I reviewed the evidence offered at trial in some

9     detail in the August 10, 2019, and November 4, 2019 orders, and

10    I will only summarize the proof here as I go through the

11    defendant's objections.

12         As an initial matter, Mr. Lora, again, argues that the

13    evidence was insufficient to support his conviction on Section

14    924(j) count, which charges him with aiding and abetting the

15    discharge of a firearm in connection with the drug-trafficking

16    conspiracy charged in the indictment, and thereby causing the

17    death of another person.

18         The evidence at trial showed that the victim of the

19    shooting was a competing drug dealer named Andrew Balcarran and

20    that Balcarran had been murdered because Lora wanted to take

21    over his drug spot.  I summarize that proof in my November 4th

22    order as follows, and I quote:

23         "The evidence at trial showed that Lora controlled a

24    drug-trafficking spot at 169th Street and Franklin Avenue in

25    the Bronx.  Lora supplied the cocaine and crack cocaine sold by

JCIKLORS

his codefendants at that location."  Citing the trial

transcript at 44-45, 107, 109-110, 127-132, 177-180, 190, 218

to 23, and 245.

          "The evidence further demonstrated that Andrew

Balcarran, the victim of the charged shooting, was a competing

drug dealer who operated on 170th Street and that Balcarran was

murdered because Lora and codefendant wanted to take over

Balcarran's 170th Street drug selling location."  (Id. at page

263.

          "One of the shooters testified that Lora was involved

in and present during the lead-up to the shooting, id. at

203-263, and that Lora reported Balcarran's location to the

shooters immediately before Balcarran was shot to death.  (Id.

at pages 255 to 56.

          "Given this evidence and drawing all permissible

inferences in favor of the government, as this Court must, see

United States v. Taylor, 816 F.3d 12 at 22 (2d Cir. 2016), a

rational trier of fact, id., could have found that Lora caused

Balcarran's death by aiding and abetting the discharge of a

firearm in furtherance of the charged narcotics conspiracy, in

violation of 18, United States Code, Section 924(j)."  Citing

Docket No. 196 at page 4.

          "The proof of the murder conspiracy is also set forth

in my August 10, 2019 order."  Citing Docket No. 190, pages

3-5.

1          Lora's renewed insufficiency argument is overruled

2    based on the evidence discussed in those two orders.

3          Mr. Lora also objected to paragraph 15 in the

4    presentence report, which states that Lora supplied cocaine to

5    members of his crew, including Luis Lopez and Luis Trujillo.

6    The evidence at trial showed that Lora controlled a

7    drug-trafficking spot, as I said, located at 169th Street and

8    Franklin Avenue.  There was also evidence that it was he who

9    supplied the cocaine and crack cocaine sold by his codefendants

10   at that location.

11         Lora's crew of drug sellers included himself, Oscar

12   Palmer, also known as Tito, Luis Lopez, Luis Trujillo, and many

13   others.  Several witnesses testified at trial that they had

14   bought cocaine directly from Lora.  This proof is discussed in

15   detail in my August 10, 2019 order, Docket No. 190, at pages 5

16   through 8.

17         The objection to paragraph 15 is overruled.

18         Lora also objects to paragraph 17 of the presentence

19   report, which states that Lora directed Trujillo and Lopez to

20   murder Balcarran.  As I have discussed, a reasonable jury could

21   have found that Lora ordered his underlings to murder

22   Balcarran.  Lora headed a drug crew that was selling drugs at

23   169th Street and Franklin Avenue, and Balcarran had a competing

24   drug operation a block away.

25         There was evidence that Balcarran had threatened

JCIKLORS

Lora's chief lieutenant, Oscar Palmer, also known as Tito, and was trying to extort him.  Citing trial transcript at 126-27, page 203, pages 250 to 54, pages 262 to 63, 278, 288 and 289 to 90.

On the day of the murder, Lora was in a car following coconspirators who were in another car as they obtained the guns that were used to kill Balcarran, and it was Lora who informed the shooters where Balcarran was standing immediately before the murder.  The shooters then drove to that site and killed Balcarran on the side of the street.

There was also evidence that one of the conspirators, Luis Lopez, told one of the shooters that Balcarran was killed, so that Lora and his chief lieutenant, Tito, could take over the drug-selling spot.  Citing the August 10, 2019 order, Docket No. 190, at pages 5-8.

The objection to paragraph 17 is overruled.

Lora also objects to paragraph 19 of the presentence report, which states that Lora was in a car following the shooter's car on the day of the murder, and that Lora circled the block looking for Balcarran.  As I said, there was evidence at trial that Lora was seated inside a vehicle that was following the shooter's car.  Citing the trial transcript at page 251.  Lora broke off at some point, and it is a fair inference that he broke off to look for Balcarran because he called the shooters from the car he was in to report where

JCIKLORS

Balcarran was standing.  Id. at page 255.  The shooters then

drove to that location, called Balcarran over to the car, and

shot him to death.

          The objection is overruled.

          Lora also objects to paragraph 20 of the presentence

report, which states that Lora drove around the block to make

sure that Balcarran was actually dead after the shooting.  I

didn't see anything in the trial transcript in which a witness

testified that Lora drove to the block after the murder.

Accordingly, I will disregard that portion of paragraph 20.

          Lora also objects to paragraph 22 of the presentence

report, which states that he wanted to take control over

Balcarran's drug spot, and that after Balcarran's death, Lora

did, in fact, gain control over that drug spot and maintained

control over it for years.

          As I said, there was evidence at trial that one of the

coconspirators told one of the shooters that Balcarran had been

killed because Lora and Tito "wanted to take [Balcarran's

drug-selling] spot on 170th," citing the trial transcript at

263.

          Moreover, there was evidence that except for a

six-month period following Balcarran's murder, Lora

continuously sold drugs on a daily basis from the 2002 murder

through 2015 in the vicinity of 169th Street and Franklin

Avenue.  It is a fair inference that the murder of Balcarran

JCIKLORS

allowed Lora to maintain his drug-selling operation for many

years in that neighborhood, the same neighborhood he had

previously shared with Balcarran.  Id. at pages 130 to 32, 134,

177 to 79, 180 to 81.

Accordingly, the objection is overruled.

Lora also objects to paragraph 23, which states that

he was the leader of a drug distribution business in the Bronx

in the vicinity of Franklin Avenue.  That is exactly what the

evidence showed.  To the extent that Lora objects to that

sentence in paragraph 23, the objection is overruled.

Paragraph 23 also states that Lora is responsible for

the distribution of 15 kilograms of cocaine and more than

700 grams of crack cocaine, but notes that the Court vacated

the jury's finding as to drug quantity.  Having vacated the

jury's findings as to drug quantity, obviously, I will

disregard the reference to 15 kilograms of cocaine and

700 grams of crack cocaine in that paragraph.

Before I turn to the guidelines calculations, let me

ask you, Mr. Pittell, if you have any other objections to the

factual portions of the presentence report?

MR. PITTELL:  No.  You've covered them all.  Thank

you.

THE COURT:  Does the government have any objection to

the factual portions of the presentence report before I turn to

the guidelines calculation?

JCIKLORS

1            MR. NICHOLAS:  No, your Honor.

2            THE COURT:  With the exception of the matters that I

3    have said I will disregard, I adopt the findings of fact set

4    forth in the presentence report.

5            Mr. Lora also objects to certain sentencing guidelines

6    calculations.  I will address those objections now.

7            Lora objects to paragraph 31, which applies Section

8    2A1.1 of the sentencing guidelines to calculate the base

9    offense level for his 924(j) conviction.

10           Section 2A1.1 is the guidelines provision for first

11   degree murder.  As I stated, the evidence was sufficient to

12   demonstrate that Lora aided and abetted the premeditated murder

13   of Balcarran.  Accordingly, that objection is overruled.

14           Lora also appears to object to paragraph 37.  Citing

15   the defendant's brief, Docket No. 204, pages 15-16.  The brief

16   is somewhat garbled at this point, and there appear to be typos

17   with respect to the guidelines references, but the argument

18   appears to be that to apply Section 2A1.1 to both Counts One

19   and Three is impermissible double-counting.

20           I reject that argument.  The guidelines for a Section

21   924(j) conviction as well as a conviction under 21, U.S.C.,

22   Section 846 clearly both call for application of Section 2A1.1,

23   where a premeditated murder is part of the underlying drug

24   conspiracy.

25           Accordingly, the objection is overruled.

1          Lora also objects to paragraph 40 of the presentence

2     report, which imposes a four-level role in the offense

3     enhancement because Lora was an organizer or a leader of a drug

4     conspiracy that involved five or more people or was otherwise

5     extensive.  As I have said, Mr. Lora was the leader of a drug

6     crew that distributed drugs in the vicinity of 169th Street and

7     Franklin Avenue for 15 years or more.  His crew consisted of

8     himself, Oscar Palmer, also known as Tito, Luis Lopez, Luis

9     Trujillo, and others, including individuals that a witness

10    referred to at trial as Pedro, Joel, and Jimmy.  Citing trial

11    transcript at 134; also, the August 10, 2019 order, Docket

12    No. 190, pages 5-8.

13         Accordingly, the four-level enhancement applies, and

14    the objection is overruled.

15         I will say that the role in the offense enhancement is

16    irrelevant here and has no impact on Lora's guidelines range

17    because the top level in the guidelines is level 43, and Lora

18    is at level 43 before the role in the offense enhancement is

19    applied.

20         Lora objects to paragraphs 86 and 87 of the

21    presentence report because they state that the applicable

22    statutory maximum term of imprisonment for the narcotics

23    conspiracy count is 30 years.  The objection is overruled.  The

24    maximum is 30 years here because the government filed a prior

25    felony information.  Citing Docket No. 76.

1          In such circumstances, the statutory maximum for a

2     violation of 21, United States Code, Section 841(b)(1)(C) is 30

3     years' imprisonment.

4          Lora objects to paragraphs 48 through 55 of the

5     presentence report because they impose criminal history points

6     for Lora's eight prior drug-trafficking convictions.  Lora

7     contends that these convictions are relevant conduct.  Citing

8     the defense brief, Docket No. 204, at page 17.  The government

9     agrees.  Citing Docket No. 206.  Accordingly, I will not impose

10    criminal history points for Mr. Lora's prior drug convictions,

11    and, contrary to the presentence report, he will not be

12    sentenced as a career offender.

13         Mr. Lora objects to paragraph 57, which imposes two

14    criminal history points because he was on probation at the time

15    of the instant offense.  Lora says he disputes that he was on

16    probation at the relevant time, but he doesn't explain why.  I

17    conclude that Lora has two criminal history points because he

18    was on probation at the time he committed the instant offense.

19         I will note that this issue is likewise irrelevant.

20    Because of level 43, the guidelines recommend life imprisonment

21    regardless of criminal history score.

22         Finally, Mr. Lora objects to paragraph 86 of the

23    presentence report, which states that a mandatory consecutive

24    minimum term of imprisonment of ten years applies to Count One,

25    the 924(j) charge.  The Second Circuit has held that Section

1    924(c) of Title 18 is incorporated into Section 924(j),

2    including the mandatory minimum sentences.  Citing United

3    States v. Barrett, 937 F.3d 126, 129, n.2, (2d Cir. 2019).

4            However, the government concedes that here the jury

5    was not asked on the jury form to make a specific finding that

6    a firearm was discharged, and that, accordingly, a five-year

7    minimum mandatory sentence rather than the ten-year minimum

8    mandatory sentence applies.

9            I conclude that under Barrett, a five-year minimum

10   mandatory sentence applies to Count One.

11           Having addressed the defendant's objections to the

12   presentence report's guidelines calculations, I will now set

13   forth my findings.  Although I'm not required to impose

14   sentence in accordance with the sentencing guidelines, I am

15   required to consider what the applicable guidelines recommend.

16           Mr. Lora was found guilty at trial of aiding and

17   abetting the use of a firearm in connection with a narcotics

18   conspiracy charged in Count Three, causing the discharge of a

19   firearm, which caused the death of Andrew Balcarran.  He was

20   also convicted of conspiracy to distribute, or possess with

21   intent to distribute, cocaine and cocaine base.

22           Pursuant to the grouping rules, Counts One and Three

23   are grouped together because Count One represents conduct that

24   would be an adjustment to the guideline applicable to the drug

25   distribution conspiracy charged in Count Three.

JCIKLORS

1    As I've indicated, the guideline for this group is

2    Section 2A1.1, which applies to Count One and is applicable to

3    Count Three by cross-reference.

4    The base offense level for Counts One and Three is 43.

5    As I've said, because Mr. Lora was an organizer or a leader of

6    the drug conspiracy, and the conspiracy involved five or more

7    people or was otherwise extensive, a four-level enhancement is

8    appropriate.  That leads to an adjusted offense level of 47.

9    However, the guidelines top out at 43.  Accordingly, Mr. Lora's

10   total offense level is 43.

11   As to criminal history, I conclude that Mr. Lora has

12   two criminal history points because he committed the drug

13   conspiracy offense while on probation.  He, thus, falls within

14   Criminal History Category II.  Offense level 43, at Criminal

15   History Category II, results in a guidelines range of life

16   imprisonment.

17   Count One also carries a mandatory minimum consecutive

18   sentence of five years' imprisonment, and, as I've said, the

19   statutory maximum term of imprisonment on Count Three is 30

20   years.

21   Accordingly, the applicable guidelines range is 30

22   years' imprisonment on Count Three, to be followed by a

23   mandatory consecutive term of five years up to life

24   imprisonment on Count One.

25   Mr. Pittell, do you have any other objections to the

JCIKLORS

guidelines calculations as I reported them?

        MR. PITTELL:  No.  You've covered them as well.  Thank you.

        THE COURT:  Does the government have any objections to the guidelines calculations as I reported them?

        MR. NICHOLAS:  No, your Honor.

        THE COURT:  Based on my independent evaluation of the sentencing guidelines, I find that the offense level is 43, the criminal history category is II, and the applicable guidelines range is 30 years' imprisonment on Count Three, plus a mandatory consecutive sentencing of five years' imprisonment up to life imprisonment, on Count One.

        I'll hear from you, Mr. Pittell, as to an appropriate sentence.

        MR. PITTELL:  Judge, I tried to cover Mr. Lora's personal background in my sentencing submission.  One thing that I didn't mention that I would like to, actually, discuss is that I urge you to consider the need for an unwarranted disparity in this case.  Even though I'm objecting, I acknowledge that your findings are a life sentence pursuant to the guidelines.  Although I don't request a specific sentence in my submission, I'm obviously requesting something less than life.

        I ask you to at least consider the sentences of Trujillo, which was only five years, the sentence of Lopez,

JCIKLORS

which was only ten years, and although Caban has not yet been
sentenced, given that he cooperated and testified at trial, I
can anticipate that he will get a significant sentencing
consideration.

While Mr. Lora, even though I objected and your Honor
has found that he was a leader, when you look at the other
sentences and the involvement, Trujillo was the one who
actually provided the guns, and he got five years.  He is the
one who instructed Caban how to shoot the guns, and only got
five years.  Lopez was the one who recruited Caban, he got ten
years.  And Caban was the one who actually was basically the
hired killer who had no personal motive -- not that that's
justification for killing somebody -- and he's the one who got
the -- will receive the benefit of cooperating.

So I ask you at least to take that into consideration,
as well as the personal information, especially the letters
that I've attached to the sentencing memorandum, when you
determine an appropriate sentence in this case.

Thank you.

THE COURT:  All right.  I'll hear from the government.

MR. NICHOLAS:  Thank you, your Honor.

I just want to make a couple of points that -- I'll
try not to repeat my submission.

I wanted to address what Mr. Pittell said, but I want
to say first that Mr. Balcarran's family and friends are not

1    here today, but as the Court knows personally, they've been

2    here for one, and I think both, of the other sentencings in

3    this case.  They were here, and I think they addressed the

4    Court at the sentencing of Mr. Lopez.  They were -- some of

5    them were here for the sentencing of Mr. Trujillo, and many of

6    them were here throughout the whole trial.  I want to let the

7    Court know, to the extent that it informs the Court's view in

8    any way of the -- I think the best kind of box for it within

9    3553(a) would be promotion of respect for the law and

10   seriousness of the offense.  The need for those things is

11   obviously plain here, but I want to impress upon the Court that

12   not that I've been here for a million years, but I have not had

13   another case as a prosecutor where the family and friends of a

14   victim in a murder case or any other kind of case, where the

15   family and friends of a victim have been as involved as they

16   have been in this case in terms of attention to what's going

17   on, emotional reaction to -- the emotional reaction during the

18   trial, their emotional state -- as the Court will remember, the

19   jury was out for a day and a half or so -- their emotional

20   state during that time, their desperate need for some measure

21   of closure in this part of their life.

22        And I think it was a humbling experience for me to

23   interact with them over and over.  It personally pressed on me

24   the kind of the hole that's been put in their life through the

25   death of Andrew Balcarran.  Their lives have been forever

JCIKLORS

1    changed.  I know they have said this directly to the Court, I

2    know they spoke at Luis Lopez's sentencing, but I thought it

3    was important to raise anyway.

4            THE COURT:  I will comment -- obviously, I presided

5    over the trial, and one of the things that struck me, and I

6    guess I should say for the record, that the murder that brings

7    us here today happened in 2002, the trial was in 2016, and I

8    believe Mr. Balcarran's daughter testified at the trial.

9            MR. NICHOLAS:  Your Honor, I don't think that his

10   daughter testified at the trial.  At the sentencing, your

11   Honor.

12           THE COURT:  Okay.  But my reaction to the daughter's

13   statements, as she spoke about the murder and the effect it had

14   on her life, and she was giving these statements many, many,

15   many years after the incident, certainly more than 14 years

16   after the incident, my reaction was that it was like the murder

17   had happened yesterday.  That was my reaction.  So I was also

18   quite struck by the continuing effect of the murder, how

19   immediate it was to her, even though so many years had passed.

20   So I do remember that quite clearly.

21           Go ahead, Mr. Nicholas.

22           MR. NICHOLAS:  Thank you, your Honor.

23           So I'll move on, your Honor.  I did want to address

24   the disparity argument that Mr. Pittell made.  It's something

25   that I raised in the government's sentencing submission, so I

JCIKLORS

won't repeat what's in the submission.  Just with respect to

what Mr. Pittell said, in imposing sentence on Mr. Lopez and

Mr. Trujillo, the Court explicated in some detail the very

specific reasons for those particular sentences.  Included

among those -- I think Mr. Trujillo had two relatively

extraordinary circumstances.  One was that, if I'm recalling

correctly, the Court found that he had cooperated in good-faith

with the Bronx District Attorney's Office for a number of

years, and --

           THE COURT:  Ten years comes to mind.

           MR. NICHOLAS:  -- and I think that he had volunteered

his role to them.  And I think he had -- I reviewed this in

preparing my submission, and I should remember the details

better, but I think he had been arrested on a much, much lesser

charge in the Bronx and had -- from the inferences that the

Court was able to draw from what had happened, appears to have

volunteered that he had played some role -- though I think he

minimized the nature of the role, he, somewhat astonishingly,

volunteered that he played a role in the murder to the Bronx

district attorney.

           The other thing with Mr. Trujillo was that he had had

some involvement in the church for quite a while, and I think a

minister, or priest, or someone of that nature may have

testified at his sentencing.  He also had no criminal history.

And his role in the murder was not too directed.

1          With respect to Mr. Lopez, he had -- if I'm
2   remembering correctly from my review of the sentencing
3   transcript, he had no criminal history, he had a much -- and
4   the Court noted the way he had spent -- not only that he had no
5   prior criminal history before the murder, but that he had none
6   after, that he had spent the intervening years building a
7   family life.  And the Court was, I think, wary of -- or I guess
8   perhaps a better way to put it is the Court was sensitive to
9   the disruptive effect that a very long sentence was going to
10  have on what Mr. Lopez had built -- had attempted to build in
11  the intervening years, and the Court was also sensitive to, and
12  noted, that Mr. Lopez was basically put in a position where
13  he -- by Mr. Lora and Mr. Palmer, Tito, where he felt like he
14  had to get this murder done, didn't want to do it himself.  He
15  did recruit Caban, and he bears a big part of the blame for
16  what happened to Mr. Balcarran because he did that, but I think
17  there were -- in thinking about avoiding an unwarranted
18  sentencing disparity, there were very specific -- the attention
19  to the detail is what was the basis, I think, for those
20  sentences, and that same attention to the detail of the way
21  this murder went down militates in favor of a substantially
22  larger sentence here.
23          There's an argument to some extent in the sentencing
24  papers that, well, Mr. Lora was not the shooter, you know,
25  Caban was the actually shooter, and Trujillo is the one who

JCIKLORS

1    taught him how to shoot, and Lopez is the one who recruited

2    Caban.  I think those facts cut both ways.  I think all of

3    those individuals bear tremendous blame for what happened, of

4    course -- that goes without saying -- but I think a person

5    should not be able to leverage or to use as a shield the fact

6    that they operated from a safe distance, the fact that they had

7    enough status -- because of the role in the drug-dealing side

8    of things, that because that status conferred on them an

9    ability not to have to be the one to fire a gun, to be the

10   person who makes the call instead of sticking their hand out

11   the window and doing the unbelievably bloody act, the fact that

12   instead of being Caban, he oversees the operation and recruits

13   a person like Caban to carry this out, that is not mitigating.

14   It's the opposite.

15           So I think the fact that his status in the

16   drug-trafficking side of things conferred on him the ability to

17   operate from a distance, and then to try to -- and then to

18   preserve some level of deniability and to -- the case is much

19   harder to make -- the case against Lora is a triable case, it

20   went to trial.  That's not necessarily the case with the way

21   that other people were involved, and it's not a coincidence

22   that Lora had a triable case.  It's because of the status that

23   Lora had with the drug-trafficking side conferred on him the

24   ability to play a certain role in the murder, a higher role and

25   a less gory role, and that is not mitigating.  It's the

JCIKLORS

1    opposite of mitigating.

2        Those are the points I wanted to make, Judge.  I know

3    that the Court has an unusual amount of familiarity with this

4    case, having presided over the trial and having presided over

5    now three sentencings.  So unless the Court has questions, I'll

6    rest.

7        THE COURT:  Mr. Lora, is there anything you wish to

8    say before the Court imposes sentence?

9        THE DEFENDANT:  No.

10       THE COURT:  In deciding upon an appropriate sentence,

11    I have considered all the factors listed in Title 18, United

12    States Code, Section 3553(a), including the nature and

13    circumstances of the offenses, Mr. Lora's personal history and

14    characteristics, the need for the sentence imposed to reflect

15    the seriousness of the offenses, the need to promote respect

16    for the law, to provide just punishment, and to afford adequate

17    deterrence.

18       Beginning with the nature and circumstances of

19    Mr. Lora's offenses:  I've already discussed the facts of the

20    case in some detail.  As I've said, Mr. Lora sold cocaine and

21    crack cocaine for more than 15 years in the vicinity of 169th

22    Street and Franklin Avenue in the Bronx.

23       His drug business led him into conflict with a

24    competing drug dealer, Andrew Balcarran.  Mr. Balcarran

25    threatened and tried to extort Mr. Lora's chief lieutenant,

Oscar Palmer, who went by the name Tito.  It is a fair

inference that Mr. Lora had decided that Balcarran would have

to be killed and that he directed his subordinates, including

Luis Lopez and Luis Trujillo, to take care of the problem.  One

of Mr. Lora's workers, Luis Lopez, approached his cousin, Dery

Caban, who had recently got out of prison, and asked him to

commit the murder of Balcarran.  Caban agreed to do so because

of the close relationship he had with Lopez.

A reasonable jury could have found that Mr. Lora

supervised the preparation from a distance.  But he was there

when the weapons were obtained from Trujillo's home, and a

reasonable jury could have found that he searched the

neighborhood to find Balcarran on the day of the murder.  And

when he located Balcarran, who was standing in front of his

home, Lora called his subordinates, who were in a second car

with the guns, to report Balcarran's location.  The shooters

then drove to Balcarran's location, and two of Lora's

coconspirators shot Balcarran to death in cold blood on the

sidewalk in front of his home, with his family inside.

After a brief interlude, Mr. Lora picked up his

drug-dealing at the 169th and Franklin Avenue location and

continued to deal drugs there over the next 13 years.

As to Mr. Lora's personal history and characteristics:

He was born in Santo Domingo in the Dominican Republic.  He's

currently 49 years old.  His father was physically abusive, but

he had a close relationship with his mother.  His parents

separated when he was young.  Lora and his many siblings were

raised in poor socioeconomic conditions, but he was provided

with the basic necessities.

He lived in the Dominican Republic until 1986.  In

Mr. Lora was never married, but has three daughters

from prior relationships.

He lived in the Dominican Republic until 1986.  In

that year, he came to the United States, settling eventually in

the Bronx.  He is a permanent resident, but currently is under

removal proceedings.

As to education:  Mr. Lora dropped out of high school.

As to employment:  He claims that he was employed at

various delis and bodegas in Manhattan and the Bronx.  However,

there is no confirmation of that, nor have any details been

provided as to that employment.

There's no significant history of substance abuse.

As to medical condition, Mr. Lora suffers from

diabetes and high blood pressure.

As to criminal record:  Mr. Lora has eight prior

convictions, all of which are drug-related.  They span the

years between 1991 and 2009.  Given this conviction history, as

well as the evidence at trial, it is a fair inference that Lora

has supported himself through drug-trafficking for most of the

many years he's been in this country.

To summarize, the guidelines recommend 30 years'

JCIKLORS

imprisonment on Count Three, to be followed by a mandatory

consecutive term of five years up to life imprisonment on Count

One.  The probation department has recommended a sentence of 30

years on Count Three, to be followed by a consecutive sentence

of life imprisonment.

The government has asked me to sentence Mr. Lora to

life imprisonment.

The defense seeks a, quote, fair and just sentence,

closed quote.

With all this in mind, I'll now describe the sentence

I intend to impose, and then I'll ask the parties if there's

anything further they wish to say.

Let me start with the issue of disparity.  I have

previously sentenced two of the codefendants, Luis Trujillo and

Luis Lopez.  The circumstances of both were unusual.  This was

a cold case.  The murder was unsolved for more than ten years.

And so it presented the unusual circumstance of an opportunity

to observe what the participants in the crime did with their

lives during the period between 2002 and their eventual arrest

many, many years later, 14 years later.  That information was

actually quite extraordinary.

First, with respect to Mr. Trujillo, who certainly

played a significant role in the murder conspiracy, it was his

home that the guns were stored in, and he did obtain the guns,

and he showed Caban how to use the weapon that Caban used.  So

he certainly was intimately involved in the murder conspiracy. But Mr. Trujillo, as Mr. Nicholas outlined, entered into a ten-year cooperative relationship with the Bronx DA's office, which was interested in prosecuting the case. It signed up Mr. Trujillo as a cooperator. And during that more than ten-year period, Mr. Trujillo appeared in court over, and over, and over again, as the case was adjourned, because the shooters couldn't be found.

And during that 14-year period between the murder in 2002 and his arrest in 2016, Mr. Trujillo had completely turned his life around. Trujillo was steadily employed during that entire period. I made a finding at the time of Trujillo's sentencing that he had lived a, quote, "law-abiding, productive, useful life for the past 14 or so years."

So, acknowledging the significant role that Trujillo had played in the murder, but also acknowledging the subordinate role he had played, and taking into account what he had done with his life in that 14-year period, I sentenced him to five years.

And then with respect to Mr. Luis Lopez, who, as Mr. Nicholas said, approached his cousin about committing the murder, I made similar findings about what Mr. Lopez had done with his life over the past 14 years. And as with Mr. Trujillo, he turned his life around after the murder. He committed no criminal acts, or at least he had no criminal

record from that point onwards, and I took those facts into

consideration, as well as his subordinate role, in imposing the

ten-year sentence that I issued with respect to him.

The record here is much, much different.  Mr. Lora has

spent most of his adult life committing crimes, drug crimes.

He consistently sold drugs in his neighborhood over a period of

more than 15 years.  There's no evidence that he's done

anything productive with his life since the murder in 2002.

He's been arrested over and over again and convicted of

drug-trafficking crimes.  It was his drug business that came

into conflict with Balcarran's drug business, and as I found, a

rational jury could have concluded that he ordered Balcarran's

murder.

Given these circumstances, I find that Mr. Lora is the

most culpable figure because he ordered the murder, and he was

the prime beneficiary of the murder.  He continued the drug

business that he had been engaged in for many years.  He

continued that business for the next 13 years, from 2002 to

2015.

So I find that giving Mr. Lora a significantly greater

sentence than Mr. Trujillo and Mr. Lopez would not create an

unwarranted disparity, for the circumstances I've just

explained.

I conclude that a severe sentence must be imposed

given the nature of Mr. Lora's crimes and the danger he

JCIKLORS

presents to the community.

         Having considered all the circumstances, I intend to impose an aggregate sentence of 30 years.  I conclude that a life sentence is not necessary, given that Mr. Lora is now 49 years old.

         As to supervised release, although I expect that Mr. Lora will be deported after serving his sentence, in the event he is not, he will be subject to an aggregate sentence of five years.

         I intend to impose the following mandatory conditions of supervision:  Mr. Lora will not commit another federal, state, or local crime;

         He will not unlawfully possess a controlled substance;

         He will cooperate with the collection of DNA as directed by the probation officer;

         He will refrain from any unlawful use of a controlled substance, and he will submit to a drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter.

         I intend to impose the 12 standard conditions of supervised release set forth in the presentence report along with the following special conditions:  Mr. Lora will submit his person and any property, residence, vehicle, papers, computer, or other electronic communication and storage devices to a search on the grounds that there's a reasonable suspicion

JCIKLORS

1    that a violation of the conditions of his supervised release

2    may be found.  Failure to submit to a search may be grounds for

3    revocation.  Mr. Lora will warn any other occupants that the

4    premises may be subject to search pursuant to this condition.

5    Any search must be conducted at a reasonable time and in a

6    reasonable manner.

7              Mr. Lora will obey the immigration laws and comply

8    with the directives of the immigration authorities.

9              I do not intend to impose a fine because I find

10   Mr. Lora lacks the ability to pay a fine.

11             I am required to impose a $200 special assessment.

12             Mr. Pittell, is there anything further you wish to

13   say?

14             MR. PITTELL:  Not at this time.  Thank you.

15             THE COURT:  Mr. Lora, anything you wish to say?

16             THE DEFENDANT:  No.

17             THE COURT:  Mr. Nicholas, anything else for the

18   government?

19             MR. NICHOLAS:  No, your Honor.  Thank you.

20             THE COURT:  Mr. Lora, for the reasons I just stated,

21   it is the judgment of this Court that you be sentenced to 25

22   years' imprisonment on Count Three and to five years'

23   imprisonment on Count One, with those terms to run

24   consecutively.

25             You are sentenced to five years' supervised release on

JCIKLORS

1    Count One and five years supervised release on Count Three,

2    with those terms to run concurrently.

3         Your term of supervised release will be subject to the

4    mandatory standard and special conditions of supervised release

5    I just mentioned.

6         You are ordered to pay a special assessment in the

7    amount of $200.

8         Mr. Pittell, do you have any requests as to

9    designation?

10        MR. PITTELL:  As close as possible to the metropolitan

11   New York City area in order to promote -- facilitate family

12   visits.

13        THE COURT:  Mr. Nicholas, are there any open counts?

14        MR. NICHOLAS:  I think Count Two has already been

15   dismissed pursuant to the Court's order.  To the extent there

16   are open counts from the S2 or S1 indictments, we ask that

17   those be dismissed.

18        THE COURT:  That motion is granted.

19        I do recommend to the Bureau of Prisons that Mr. Lora

20   be incarcerated as close as possible to the New York City

21   metropolitan area, so that he may maintain ties with his family

22   and friends during his period of incarceration.

23        Mr. Lora, I am required to advise you of your appeal

24   rights.  You can appeal your conviction if you believe that

25   your conviction was unlawful or that it was not supported by

JCIKLORS

1    the evidence.

2          You also have the right to appeal the sentence I

3    imposed.  With few exceptions, any notice of appeal must be

4    filed within 14 days of judgment being entered in your case.

5    Judgment will likely be entered later this week.  Mr. Pittell

6    will discuss with you whether or not you wish to file a notice

7    of appeal.  If you're not able to pay the costs of an appeal,

8    you may apply for leave to appeal in forma pauperis.  If you

9    request, the Clerk of Court will prepare and file a notice of

10   appeal on your behalf.

11          Is there anything else?

12          MR. NICHOLAS:  No, your Honor.

13                              * * *

14

15

16

17

18

19

20

21

22

23

24

25