NARILOS

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4               v.                              14 Cr. 652 (PGG)

5   EFRAIN LORA,

6                                               Sentence
                    Defendant.
7   ------------------------------x

8
                                                New York, N.Y.
9                                               October 27, 2023
                                                3:00 p.m.
10

11  Before:

12                      HON. PAUL G. GARDEPHE,

13                                              District Judge

14                          APPEARANCES

15  DAMIAN WILLIAMS
         United States Attorney for the
16       Southern District of New York
    DAVID ROBLES
17       Assistant United States Attorney

18  GRAVEL & SHEA
         Attorneys for Defendant
19  BY:  DAVID WILLIAMS

20

    Also Present:
21

    Gabriel Mitre, Interpreter (Spanish)
22  Jill Hoskins, Interpreter (Spanish)

23

24

25

NARILOS

1          (Case called)

2          MR. ROBLES:  Good afternoon, your Honor.  David Robles

3    for the government.

4          MR. WILLIAMS:  Good afternoon.  David Williams from

5    Burlington, Vermont.

6          THE COURT:  This is on my calendar for purposes of

7    resentencing.  The procedural history is as follows:  The

8    defendant was convicted at trial of (b)(1)(A) violation of 21

9    United States Code, Section 864, narcotics conspiracy and also

10   aiding and abetting the discharge of a firearm in connection

11   with a drug conspiracy, a discharge that resulted in the death

12   of a person in violation of 18 United States Code, Section

13   924(j).  He was also convicted after causing an intentional

14   killing of Andrew Balcarran in connection with the charged drug

15   conspiracy in violation of 21 United States Code, Section

16   848(e)(1)(A).  In an August 10, 2019 order, I vacated the

17   jury's finding as to drug quantity finding that the government

18   had not proven (b)(1)(A) quantities beyond a reasonable doubt.

19   I therefore vacated the defendant's conviction on Count Two,

20   the 848 count, because the government had not proven that the

21   underlying drug conspiracy involved (b)(1)(A) quantities of

22   drugs which is a requirement for a Section 848(e) conviction.

23   I otherwise upheld the jury's verdict citing docket 190.

24          On September 3, 2019, the defendant moved for leave to

25   file a judgment -- a motion for a judgment of acquittal on the

NARILOS

1    924(j) count arguing that the evidence was insufficient to

2    state his conviction.  I denied that motion on November 4, 2014

3    citing docket 196.  On December 18, 2019 I sentenced the

4    defendant to 25 years imprisonment on the narcotics conspiracy

5    count and to five years imprisonment on the section 924(j)

6    count with those terms running consecutively citing the

7    judgment, docket No. 207.  At sentencing, I noted that pursuant

8    to *United States v. Barrett*, 937 F.3d 126 at 12902, Second

9    Circuit 2019, the sentence I imposed on the section 924(j)

10   count had to run consecutive to the sentence imposed on the

11   narcotics conspiracy count.  And had to be at least five years

12   imprisonment in accordance with 18 United States Code,

13   Section 924(c), citing the sentencing transcript docket No. 210

14   at pages 12 through 13.

15          On December 23, 2019, the defendant appealed his

16   conviction arguing, among other things, that the evidence was

17   insufficient to support his section 924(j) conviction.  On

18   March 8, 2022, the Second Circuit affirmed, by summary order,

19   citing *United States v. Lora* 2022 Westlaw 453 368, Second

20   Circuit February 15, 2022.  The defendant petitioned for

21   certiorari on the issue of whether a sentence imposed for a

22   section 924(j) conviction must run consecutively to any other

23   sentence imposed at the same time.  On July 18, 2023, the

24   Supreme Court ruled that a conviction under 18

25   United States Code, Section 924(j) does not require the

NARILOS

 1    imposition of a mandatory consecutive sentence.  It vacated the

 2    Second Circuit's judgment and remanded the case for further

 3    proceedings.  See *Lora v. United States* 599 U.S. 453, 2023.  On

 4    July 19, 2023, the Second Circuit vacated this Court's judgment

 5    and remanded the case for further proceedings consistent with

 6    the Supreme Court's decision citing docket No. 321.  On

 7    July 20, 2023, I set resentencing for August 4, 2023.  At the

 8    government's request, I adjourned resentencing until today

 9    citing docket 322, 325, 334, and 336.  In preparation for this

10    resentencing, I have read the revised presentence report dated

11    December 4, 2019.  I have read the government's submissions

12    dated December 13, 2019, December 16, 2019, August 8, 2023,

13    August 10, 2023, and September 8, 2023, as well as the

14    defendant's December 13, 2019 and August 10, 2023 submissions,

15    and the attached exhibits.

16            Mr. Williams have you read the revised presentence

17    report's recommendation and discussed it with Mr. Lora?

18            MR. WILLIAMS:  Yes.

19            THE COURT:  Mr. Lora, has the presentence report been

20    read to you in Spanish and have you discussed it with

21    Mr. Williams?

22            THE DEFENDANT:  I have not received any paperwork in

23    Spanish.  I have asked that all the paperwork be given to me in

24    Spanish.  I have not received a single document in Spanish

25    about my court appearance.

NARILOS

1          THE COURT:  I asked you a different question.  I am

2     going to repeat the question.

3          MR. WILLIAMS:  Your Honor, if I may.  I did not, read

4     to him the entire presentence report.  That was done by my

5     predecessor counsel as indicated in the earlier sentencing

6     proceeding.  Nothing in that presentence report has changed.  I

7     met with my client in August in preparation for what I thought

8     would be the sentencing hearing in early August.  We went over

9     the sentencing issues with him and what I was going to do and

10    what I had done in my sentencing submissions.  He has, in fact,

11    asked me for Spanish translations of the hundreds of pages of

12    documents that I have submitted to the Court.  I am here *pro*

13    *bono*.  I don't have the resources to translate everything into

14    Spanish.

15         THE COURT:  So, Mr. Lora, the question I have for you

16    is at any point in time, whether 2019 or in 2023, the

17    presentence report has been read to you in Spanish?

18         THE DEFENDANT:  No.

19         THE COURT:  OK.  We are going to have to adjourn.  The

20    defendant has a right to know what is in the presentence

21    report.  It hasn't, apparently, been read to him in Spanish.

22    So, I see no way that we can proceed today.

23         MR. WILLIAMS:  There are Spanish interpreters here

24    today.  I know the court is paying for them.  Is there any

25    chance that they could work with us today to go over the

NARILOS

1    presence report, which I have with me, so that at least when

2    we come back whenever, there will be an affirmative answer to

3    that question?

4            THE COURT:  Is the interpreter available?  You are?

5            MR. MITRE:  Your Honor, it is defense counsel's

6    responsibility to arrange for that.  But if your Honor so

7    orders, we are here to follow whatever you decided.

8            THE COURT:  Yes.  I think defense counsel makes a

9    point, which is that we should try to take advantage of the

10   fact that we have the interpreter, we have the presentence

11   report.  There is no reason why it can't be interpreted to him

12   now.  It is going to take some time because it is a lengthy

13   document.  So, I don't think we can do much more than have the

14   document read to him today.  But I think we should take

15   advantage of the time and the availability of the interpreter

16   and get as much done today as we possibly can.

17           MR. WILLIAMS:  I appreciate that.  We will be back

18   whenever the Court sets the case for rehearing.

19           THE COURT:  Just give me a moment because I want to

20   check.  I want to check the sentencing transcript because, of

21   course, it is my practice always to inquire of a defendant who

22   doesn't speak English whether the presentence report has been

23   read to him in Spanish.  So, I want to see whether I did that

24   back at the original sentencing that preceded the appeal.  So,

25   just give me a moment if you would.

NARILOS

1          I am looking at the sentencing transcript from the

2    December 18, 2019 sentencing, the original sentencing.  The

3    first thing I will say is that the transcript indicates that

4    two Spanish interpreters were present for the sentencing.  At

5    the outset of the sentencing, I said the following to Mr. Lora,

6    and I quote, Mr. Lora, has the presentence report been read to

7    you in Spanish and have you discussed it with Mr. Patell.  It

8    says the interpreter, yes, the defendant responded in English.

9          So, back on December 18, 2019, the defendant told me

10   that the presentence report had been read to him in Spanish.

11   Can you consult with him to find out why he is saying something

12   different today?

13          MR. WILLIAMS:  I will.

14          THE COURT:  OK.

15          MR. WILLIAMS:  It has been a while since I read the

16   sentencing transcript, but that was my understanding of what

17   happened.

18          THE COURT:  Maybe you can take a moment and talk with

19   him about this.

20          MR. WILLIAMS:  Thank you for that opportunity, your

21   Honor.  Mr. Lora now remembers.  I showed him my copy of the

22   transcript.  He remembers he did, in fact, have that

23   opportunity to have it read to him in Spanish way back almost

24   four years ago.  I explained to him that nothing has changed in

25   the report since then.  I explained that I had submitted some

NARILOS

1    new material that may or may not be referred to by the court

2    including individualized needs plan, and I also explained to

3    him the fact that the mandatory -- the maximum sentence for the

4    drug conviction is now 20 years and that the Court does not

5    have to sentence him to a consecutive five-year mandatory

6    minimum sentence, and that those changes will probably be

7    reflected at today's sentencing hearing.

8              THE COURT:  All right.

9              So, Mr. Lora, you now remember that the presentencing

10   report was read to you before the original sentencing in 2019?

11             THE DEFENDANT:  Yes, your Honor.

12             THE COURT:  Now, it has been --

13             THE DEFENDANT:  What happens is that I got a letter

14   from the court once, and in the letter it said that the maximum

15   that I could face over the drugs, they were saying that it was

16   ten to 15 kilos, and it was 15 grams they found on me not 15

17   kilos.  Ten to sixteen months.

18             THE COURT:  I'm sorry, I am not understanding.

19             MR. WILLIAMS:  I don't understand that either, your

20   Honor.  I am unaware of any --

21             THE DEFENDANT:  I sent him copies of the paperwork.

22             MR. WILLIAMS:  I am unaware of any correspondence from

23   the court to my client.  I have provided my client with copies

24   of many of the documents that I have filed with the Court,

25   except for those that I filed under seal.  For obvious reasons,

NARILOS

1    I didn't want those floating around the jailhouse.  But I am --

2    I don't know where -- I don't understand what he is talking

3    about.

4              THE COURT:  Well, I think, what he may be talking

5    about is something I touched on at the outset which is that

6    originally the government had argued (b)(1)(A) quantities of

7    drugs and I issued a decision, despite the jury's verdict,

8    finding that the government had not proven (b)(1)(A) quantities

9    of drugs.  So, it may be that that is what he is talking about

10   when he is referring to the 15 kilograms of cocaine.

11             But, what I need to know, Mr. Lora, is first of all,

12   you now recall that the presentence report was read to you in

13   Spanish?

14             THE DEFENDANT:  I do remember that it was read to me

15   in Spanish, but what I don't understand, your Honor, and excuse

16   me, but I was never caught with any drugs on me.  And they are

17   putting on me 15 kilos or 280 grams of crack cocaine.  But my

18   police report shows I wasn't caught with anything.

19             THE COURT:  That is what I am trying to explain to

20   you, sir, is that after your trial, although the jury had

21   convicted you of having possessed five kilograms or more of

22   cocaine as well as other quantities of drugs, I decided that

23   that verdict was not supported by the evidence.  So, you are

24   not facing the mandatory sentences associated with the

25   quantities of drugs that you are referring to.  Do you

NARILOS

1    understand what I am saying?

2            THE DEFENDANT:  I understand that, your Honor.

3            THE COURT:  There is no mandatory time that applies to

4    you either as to the drugs or as to the murder count.

5            THE DEFENDANT:  I understand that, but I will tell you

6    one thing.  I have never touched a firearm in my entire life

7    and I have never hung out with that person.  I have never hung

8    out with any of those four.  I have been working at a bodega

9    for 24 years with the same people.  And of those people, none

10   of those people sells drugs.  So, I don't understand why I am

11   being accused of something I haven't done.  Because if I were

12   guilty of this, I wouldn't be telling you this right now

13   because I have family, I have children, I have grandchildren.

14   And I've spent my whole life just working.  On my bank card, I

15   don't even think I have $200 there.

16           THE COURT:  All right.  It is important that you

17   understand that there was a trial in this case and the jury

18   found you guilty.

19           THE DEFENDANT:  I understand that.  But what happens

20   is that I, presumably, was to have called Tito when that

21   happened.  And I didn't place that call.  They found out

22   themselves that it wasn't me who placed that call.  It was

23   someone else.  And regardless, I am getting so much time.

24           THE COURT:  My question to you, Mr. Lora, is

25   understanding that you had the presentence report read to you

1  in Spanish, back in 2019, that is four years ago.

2          THE DEFENDANT:  Exactly.

3          THE COURT:  Do you want the presentence report read to

4  you again given the passage of time, read to you again in

5  Spanish?

6          THE DEFENDANT:  No, your Honor.  And I respect your

7  decision if you have considered everything that has been found

8  out.  And my family are not people to be doing things on the

9  street.

10          THE COURT:  OK.  So, I am going to proceed with the

11  resentencing because the defendant has indicated that the

12  presentence report was previously read to him in Spanish and

13  that he sees no need to have it read to him again.

14          The defendant has objected to factual portions of the

15  presentence report as well as to the guidelines calculations

16  set forth in the presentence report.  Citing the defendant's

17  objections, docket No. 331.  I am going to address the factual

18  objections to the resentence report now.

19          I reviewed the evidence offered at trial in some

20  detail in the August 10, 2019 order and in the November 4, 2019

21  order, and I will only summarize the proof here.  As I stated

22  in the November 4, 2019 order, and I quote, the evidence at

23  trial show that Lora controlled a drug trafficking spot at

24  169th Street and Franklin Avenue in the Bronx.  Lora supplied

25  the cocaine and crack cocaine sold by his co-defendants at that

NARILOS

location.  See for example trial transcript at 44-45, 107,

109-110, 127-132, 177-180, 190, 218, 223, and 245.  The

evidence further demonstrating that Andrew Balcarran, the

victim of the charged shooting, was a competing drug dealer who

operated on 170th Street and that Balcarran was murdered

because Lora and a co-defendant wanted to take over Belcarran's

170th Street drug selling location.  *Id.* at page 263.  One of

the shooters testified that Lora was involved in and present

during the lead up to the shooting.  *Id.* at page 203 and 263.

And that Lora reported Balcarran's location to the shooters

immediately before Balcarran was shot to death*.  Id.* at pages

255 to 256.  Given this evidence and drawing all permissible

inferences in favor of the government, as this Court must, see

*United States v. Taylor*, 816 F.3d 12 at 22 Second Circuit

(2016), a rational trier of fact *Id.* could have found Lora

caused Balcarran's death by aiding and abetting the discharge a

firearm in furtherance of the charged narcotics conspiracy in

violation of 18 United States Code, Section 924(j), close quote

citing the November 4, 2019 order docket No. 196, page 3.  The

proof of the murder conspiracy is also summarized in my

August 10, 2019 order citing docket No. 190 at pages 3 through

5.

        I will now turn to the defendant's objections to the

factual portions of the presentence report.  Many of the

objections were made at the original sentencing back on

NARILOS

1  December 18, 2019.  At the outset, let me say the most damaging

2  evidence against Lora came in through Dery Caban, Lora's

3  co-conspirator in the murder of Andrew Balcarran.  Caban was

4  the cousin of Luis Lopez, a member of Lora's drug crew, and it

5  was Luis Lopez's idea to approach his cousin about committing

6  the murder of Balcarran, citing presentence report paragraph

7  16.  I have observed Caban testify about these matters on three

8  occasions.  First, at Lora's trial, then at co-defendant Luis

9  Trujillo's *Fatico* hearing, and then at co-defendant Oscar

10 Palmer's *Fatico* hearing.  At each proceeding, Caban was the

11 critical witness.  And at each proceeding, Caban was

12 cross-examined by a highly experienced defense counsel.  On all

13 three occasions, I found Caban's account of Balcarran's murder

14 and the defendant's drug trafficking activities credible.  And

15 Lora's jury, likewise, must have found Caban credible because

16 their verdict turned on his testimony.

17         In any event, I will now address paragraph by

18 paragraph Lora's objections to the factual portions of the

19 presentence report.  Lora objects to paragraph 13 of the

20 presentence report which provides information about his

21 institutional adjustment.  Lora argues that this paragraph

22 should be updated to reflect the information set forth in his

23 most recent individualized needs plan program review dated

24 August 17, 2022, citing the defendant's objections to docket

25 331 at page 1.  See also docket No. 333-2.  The government does

NARILOS

1    not disagree, citing docket No. 337 at page 3.  Accordingly,

2    the objection is sustained and I will consider the August 17,

3    2022 individualized needs plan program review.  In connection

4    with paragraph 13 of the presentence report, I should also note

5    that there is a typographical error which will be corrected.

6    There is a reference to someone named Ferrero.  That reference

7    will be changed to Lora.

8         Lora objects to paragraph 15 of the presentence

9    report, and states that he supplied cocaine to members of his

10   crew including Louise Trujillo and Luis Lopez.  Paragraph 15

11   further states Lora was a leader primarily supplier of drugs

12   and that Trujillo and Lopez reported to Lora.  Lora argues

13   that, quote, there is no direct and/or reliable evidence that

14   Trujillo and Lopez were members of Lora drug distribution crew,

15   close quote.  That quote, there is no evidence circumstantial

16   or direct that Trujillo ever sold drugs for Lora or that he

17   took orders from Lora, close quote.  That when Lopez met with

18   federal investors in proffer sessions, quote, Lopez never

19   alleged that he ever sold drugs for Lora or took orders from

20   him, close quote.  And that at his change of plea hearing,

21   Lopez referred to Palmer, not Lora, as his quote, boss, close

22   quote citing defendant's objections docket No. 331 at pages 1

23   through 2, quoting docket No. 59 at pages 18 through 19.  The

24   evidence at trial, however, showed Lora controlled a drug

25   trafficking spot at 169th Street in Franklin Avenue in the

NARILOS

1    Bronx.  Lora supplied the cocaine and crack cocaine sold by his

2    co-defendants at that location.  See for example trial

3    transcript at pages 44-45, 107-110, 127-132, 177-180, 190,

4    218-223 and 245.  Lora, himself, sold drugs at that location

5    and he oversaw a crew that sold drugs for him including Oscar

6    Palmer, also known as Tito, Luis Lopez, and others.  Several

7    witnesses testified at trial that they had bought cocaine

8    directly from Lora.  This proof is discussed in detail in my

9    August 10, 2019 order, citing docket No. 190 at pages 5-8.

10   Moreover, at Palmer's June 28, 2022 *Fatico* hearing, Caban

11   testified that Lopez introduced Palmer to Caban as Lopez's

12   boss, which he understood to mean, quote the person who was in

13   charge of selling the drugs, close quote, and that Lopez also

14   told Caban that Lora was Palmer's "boss" citing the Palmer

15   *Fatico* hearing transcript, docket No. 293 at pages 125 and 131.

16   Caban also overheard Palmer and Lopez complaining about

17   "stingy" Lora was and sharing the profits from his drug

18   operation.  In sum, to the extent that Lora objects to the

19   statement that he was a, "leader and primary supplier," of the

20   drug distribution crew, the objection at paragraph 151

21   overruled.  As to whether Luis Trujillo sold drugs for Lora, at

22   Palmer's September 19, 2022 *Fatico* hearing, I stated that I

23   was, "not aware of any evidence that Trujillo actually sold

24   drugs at the Franklin Avenue location" or any evidence

25   demonstrating that, "Trujillo and Palmer viewed as partners the

NARILOS

1  drug distribution business."  Citing the September 19, 2022

2  transcript, docket No. 311 at page 28.  Accordingly, to the

3  extent that Lora objects to the presentence report statement

4  that Luis Trujillo sold drugs for Lora, the objection is

5  sustained.  Lora objects to paragraph 16 of the presentence

6  report which states Palmer, Trujillo, and Lopez were threatened

7  by Balcarran.  Lora argues that, "There is no evidence

8  supporting the allegation that Andrew Balcarran ever threatened

9  Luis Trujillo."  Citing the defendant's objections docket

10  No. 331 at page 2.  The government states that it, "has no

11  objection to striking Trujillo's name from that sentence"

12  because the evidence shows that, "there was a dispute between

13  Balcarran and Palmer about drug dealing territory that resulted

14  in Balcarran threatening Palmer who had who held a supervisory

15  role in the drug conspiracy led by Lora."  Citing the

16  government's brief 337 at page 5.  I am, therefore, sustaining

17  Lora's objection to paragraph 16.

18       Lora also objects to paragraph 17 which states that he

19  directed Trujillo and Lopez to, "take care of the problem, and

20  get rid of Balcarran."  As I have already discussed, a

21  reasonable jury could have concluded that Lora ordered his

22  underlinings to murder Balcarran.  Lora led a drug crew selling

23  drugs at 169 Street and Franklin Avenue, Balcarran had a

24  competing drug operation a block away.  There was evidence that

25  Balcarran had threatened the chief lieutenant, Oscar Palmer,

NARILOS

also known as Tito, demanding that he either stop selling drugs
at that location or that he sell drugs for Balcarran.  Citing
the trial transcript at pages 126-127, 203, 250-254, 262-263,
278, 289-290.  On the day of the murder, Lora followed his
co-conspirators by car as they obtained the firearms that were
used to kill Balcarran.  He drove around the neighborhood
searching for Balcarran.  And it was Lora who informed the
shooters where Balcarran was standing immediately before the
murder.  And there was evidence that one of the conspirators,
Luis Lopez, told one of the shooters that Balcarran was killed
so that Lora and his chief lieutenant, Tito, could take over
Balcarran's drug selling spot.  See August 10, 2019 order
docket No. 190 at pages 5 through 8.  Lora argues, however,
that at Palmer's sentencing, I struck a similar statement and
Palmer's presentence report noting that I was, quote, unaware
of evidence demonstrating that Lora told Palmer, to quote, take
care of the problem, close quote.  Citing defendant's objection
docket No. 331 at page 2, which in turn is quoting the
September 19, 2022 transcript, docket No. 311 at page 26.  But
paragraph 17 of Lora's presentence report addresses his
interactions with Trujillo and Lopez, not his interactions with
Palmer.  In any event, while there was no testimony at trial
that Lora told Trujillo and Lopez to, "take care of the
problem," it is a fair inference from the evidence that
Trujillo and Lopez were acting at Lora's behest and collecting

NARILOS

the guns to used to kill Balcarran and in approaching Caban
about committing the murder.  Lora tailed his co-conspirators
as they collected the guns.  He searched for Balcarran in the
neighborhood.  He informed the shooters where Balcarran was
immediately before the murder and he was the primary
beneficiary of Balcarran's murder.  As I noted in sentencing
Palmer, "it is a fair inference from the evidence that Lora,
Palmer, and Lopez had concluded that if they wanted to continue
selling drugs at that location, they would have to murder
Balcarran."  Citing the September 19, 2022 transcript, docket
No. 3311 at page 17.  In sum, to the extent that paragraph 17
suggests there was evidence at trial that Lora told Trujillo
and Lopez to, "take care of the problem," Lora's objection is
sustained.  But that does not change the fact, that Palmer,
Trujillo, and Lopez were acting at Lora's behest in connection
with the murder of Balcarran.

        Lora objects to paragraph 22 of the presentence report
which states that he wanted to take control of over Balcarran's
drug spot, and that after Balcarran's death, Lora did, in fact,
gain control over that drug spot and maintained control over it
for years.  Lora argues that Caban's, "hearsay testimony he
learned from Lopez that Balcarran was murdered, because Lora
wanted to take over Balcarran's drug spot is directly
contradicted by the hearsay declarant Luis Lopez."  Citing
statements Lopez made to federal investors between

NARILOS

December 2015 and February 2016 as well as certain statements

Lopez made at his guilty plea.  Citing defendant's objection,

docket No. 331 at pages 2 through 3.

The hearsay point is wrong for multiple reasons.  As

an initial matter and as Lora's counsel well knows, having

represented Lora on appeal, the Second Circuit found that

Caban's testimony was not hearsay but instead was a statement

against interest under federal rules of evidence 804(b)(3),

citing *United States v. Lora*, 2022 Westlaw, 453368 at *1-2,

Second Circuit, February 15, 2022.  In any event, a court may

consider hearsay at sentencing because the rules of evidence do

not apply at sentencing.  In any event, as I have said, Caban's

testimony has been tested through vigorous cross-examination at

three proceedings.  To the extent that there is any gap between

his account on this point and what Lopez has said, I find Caban

to be more reliable.  Finally, as I have stated, Lora was the

primary beneficiary of Balcarran's murder.  The evidence at

trial showed that except for a 6-month period following

Balcarran's murder, Lora sold drugs at the 169th Street and

Franklin Avenue location on the daily basis between 1997 and

2015.  It is a fair inference that the murder of Balcarran

allowed Lora to maintain his drug-selling operation for many

years in that neighborhood, the same neighborhood he previously

shared with Balcarran.  Citing the trial transcript at 130-132,

134, 177, 179, 180-181.  Accordingly, the objection to

NARILOS

1   paragraph 22 is overruled.

2          Lora also objects to paragraph 23.  That paragraph

3   states he was the leader of a drug distribution in the Bronx in

4   the vicinity of Franklin Avenue.  That is exactly what the

5   evidence showed.  To the extent that Lora objects to that

6   sentence, the objection is overruled for reasons I have already

7   explained.  Paragraph 23 states that Lora responsible for the

8   distribution of 15 kilograms of cocaine and more than 700 grams

9   of crack but notes that the Court vacated the jury's findings

10  as to drug quantity.  As I stated at the prior sentence, and I

11  have repeated here today, I will disregard the reference to

12  15 kilograms of cocaine and the reference to 700 grams of crack

13  cocaine.

14          As I also stated at the prior sentence, I will

15  disregard the portion of paragraph 20 that states that Lora

16  drove around the block to make sure that Balcarran was actually

17  dead after the shooting.  The evidence at trial does not

18  support that assertion.

19          Does defense counsel have any additional objections to

20  the factual portion of the presentence report?

21          MR. WILLIAMS:  Not to the facts, your Honor.

22          THE COURT:  Does the government have any observation

23  to the factual portion of the presentence report?

24          MR. ROBLES:  No, your Honor.

25          THE COURT:  With the exception of the matters I said I

NARILOS

would disregard and the objections I have sustained, I hereby

adopt the findings of fact set forth in the presentence report.

Although I am not required to impose sentence in

accordance with the sentencing guidelines, I am required to

consider what the guidelines recommend.  Here, as I mentioned,

the defendant was found guilty at trial of aiding and abetting

the use of a firearm in connection with a narcotics conspiracy,

and thereby causing the death of Andrew Belcarran.  He was also

convicted of conspiracy to distribute or possess with an intent

to distribute cocaine and cocaine base.

Pursuant to the grouping rules of the sentencing

guidelines, these two counts are grouped together because Count

One represents conduct that would be an adjustment to the

guideline applicable to the drug conspiracy charge in Count

Three.  The guideline for the group defenses is found in

section 2(a)(1).1 of the sentencing guidelines which applies to

Count One and is applicable to Count Three by cross reference.

Lora has objected to the guidelines calculations set forth in

the presentence report, citing the defendant's objections to

docket 331 and he has moved to strike the prior felony

information filed by the government pursuant to Title 21 of the

United States Code, Section 851.  Citing the defendant's motion

docket No. 329.

I will address these objections and the motion now.

Lora objects to paragraph 37 of the presentence report which

1    states that the base offense level is 43.  Lora contends, "the

2    evidence in this case is insufficient to prove that

3    Andrew Belcarran's murder was premeditated."  Citing

4    defendant's objection docket No. 331 at page 3, Lora first

5    contends that, "no one directed or, for that matter, even asked

6    Dery Caban to shoot Balcarran with a shotgun provided him to by

7    Palmer and Trujillo."  That during Trujillo's *Fatico* hearing,

8    Caban testified before Trujillo handed him the shotgun, Caban

9    did not think that, "Tito wanted to kill Balcarran," but that

10   once Trujillo gave him the weapon, Caban, "had an understanding

11   of what he was going to do, i.e. shoot Andrew Balcarran."  And

12   that, "there is no evidence that Lora observed Trujillo provide

13   Caban with a shotgun or that he otherwise knew that Caban was

14   armed when Trujillo pulled his car over once they found

15   Balcarran."  *Id.* at pages 3 to 4.

16           For reasons I have already explained, the evidence was

17   more than sufficient to demonstrate that Lora aided and abetted

18   the premeditated murder of Balcarran.  As an initial matter,

19   the conspirators picked up a shotgun and a handgun.  A

20   reasonable jury could have found that they picked up the

21   firearms because the plan was to shoot Balcarran.  Lora then

22   drove around the neighborhood trying to find Balcarran.  Once

23   he did, he communicated to the shooters where Balcarran was,

24   not so they could drop by and say hello, but instead so they

25   could shoot Balcarran with the firearms they had just picked

1    up.

2            The Second Circuit has already stated that, "the

3    sequence of events [I have just described] would allow a

4    rational jury to determine beyond a reasonable doubt that Lora

5    was an accomplice to the murder of Balcarran."  Citing Lora

6    2022, Westlaw, 453368 at *3.  Accordingly, the objection to

7    paragraph 37 is overruled.

8            Lora also objects to paragraph 40 of the presentence

9    report which imposes a four level rule in offense enhancement

10   because Lora was an organizer and leader of a drug conspiracy

11   that involved five or more people or was otherwise extensive.

12   Lora argues that, "there is no reliable evidence that he was

13   the leader or organizer of a group of 5 or more neighborhood

14   street-level drug dealers."  Accordingly to Lora, "the evidence

15   indicates that Lora was a lookout who had no advance knowledge

16   that Caban was either armed or that he intended to shoot and

17   kill Balcarran."  Accordingly, Lora says he should actually

18   receive a two-level reduction in his offense level under

19   section 3B1.2B of the sentencing guidelines.  Citing the

20   defendant's objection, docket No. 331 at page 5.

21           As I have stated however, the evidence shows that Lora

22   was the leader of a drug crew that distributed drugs in the

23   vicinity of 169th Street and Franklin Avenue for more than ten

24   years.  His crew included himself, Oscar Palmer, also known as

25   Tito, Luis Lopez and others, including individuals that a

NARILOS

1    witness referred to as Pedro, Joel, and Jimmy.  Citing the

2    trial transcript at 134.  See also August 10 2019 order docket

3    No. 190 at pages 5 through 8.  In sum, the four-level

4    enhancement applies and the objection is overruled.

5           In any event, the finding as to role in the offense

6    has no impact on Lora's guidelines range because the top of the

7    guidelines is level 43 and Lora is at level 43 before any role

8    on the offense enhancement is applied.

9           Lora objects to paragraph 45 which states that the

10   total offense level is 43.  He argues that based upon his

11   objections to the guidelines calculations, the total offense

12   level should be 36.  Citing the defendant's objections, docket

13   No. 331 page 5.  Because I overruled the defendant's objections

14   to the presentence report guidelines calculations, the total

15   offense level remains 43 and this objection is likewise

16   overruled.

17          Lora objects to paragraphs 56 through 59 which

18   addresses criminal history.  Lora notes that at the first

19   sentence, I concluded that I would, "not impose criminal

20   history points for Mr. Lora's prior drug convictions."  Citing

21   defendant's objections docket No. 331 at page 5 which, in turn,

22   is quoting the sentencing transcript docket No. 210 at page 12.

23   At the original sentence, I concluded that contrary to the

24   presentence report, Lora would not be sentenced to as a career

25   offender.  Citing the sentencing transcript, docket 210 at page

NARILOS

1    12.  I reach the same conclusions here as to both points.

2         As to paragraph 57, Lora objects to the imposition of

3    two criminal history points.  Because he was on probation at

4    the time of the instant offense.  Citing the defendant's

5    objections -- I'm sorry?

6         THE DEFENDANT:  I wasn't on probation.

7         THE COURT:  At the first sentence, I noted that Lora

8    disputed that he was on probation at the relevant time but that

9    he had not explained the basis for his objection.  I concluded

10   at the original sentencing that Lora has two criminal history

11   points because he was on probation at the time he committed the

12   instant offense.  Citing the sentencing transcript docket

13   No. 210 at page 12.  Lora now argues that the instant offense

14   occurred on August 11, 2002 and that paragraphs 49 through 52

15   of the presentence report indicated that he received

16   conditional discharge sentences for four misdemeanor drug

17   offenses, and that he completed those sentences on

18   September 19, 2001, October 3, 2002, and December 24, 2002.

19   Lora further argues that under the New York penal law, "when a

20   court imposes a sentence of conditional discharge, the

21   defendant shall be released without imprisonment or probation

22   supervision."  Citing defendant's objection docket No. 331, at

23   page 6 which, in turn, is quoting the penal law section

24   65.05(1)(a) and (2).  The S3 indictment charges Lora with a

25   narcotics conspiracy that ran from 1990 to 2015 however.  And

NARILOS

1    in 2009, Lora was sentenced on two separate occasions to

2    five-year terms of probation following two 2008 convictions for

3    criminal possession of a controlled substance in the third

4    degree.  Citing the presentence report paragraphs 54 through

5    55.  The government contends that, "because Lora's prior

6    convictions constitute relevant conduct under USSG section

7    4A1.2 the two-point enhancement for committing the instant

8    offense while on probation does not apply," and that

9    "accordingly, Lora has no criminal history points and falls

10   into criminal history category I."  Citing the government's

11   submission, docket No. 337 at page 9 which in turn is citing

12   USSG section 4A1.1D application note 4.  I will accept this

13   logic and I will not impose two criminal history points for

14   committing the instant offense while on probation.  I will note

15   that this issue is likewise academic because at level 43, the

16   guidelines recommend life imprisonment regardless of criminal

17   history score.

18        Lora objects to paragraph 86 of the presentence report

19   which states that a mandatory consecutive minimum term of

20   imprisonment of ten years imprisonment applies to Count One,

21   the section 924(j) charge.  As I noted at the outset, the

22   Supreme Court has decided in this case that, "The consecutive

23   sentence mandate in section 924(c)(1)(D)(2) this does not

24   govern section 924(j) sentences."  Citing *Lora* 599US at 143.

25   Lora's objection to paragraph 86 is therefore sustained.

NARILOS

1          Section 924(j) does not mandate any particular term of

2    imprisonment for the section 924(j) charge nor does it mandate

3    that any sentence that is imposed on section 924(j) conviction

4    run consecutively to another term of imprisonment.

5          Lora also objects to paragraph 86 on the ground that

6    his, "prior conviction under New York Penal Code Section

7    220.16(1) does not qualify as a felony drug conviction under 21

8    United States Code, Section 802(44)."  Citing defendant's

9    objection docket No. 331 at page 6.  Lora also moves to strike

10   the prior felony information that the government filed pursuant

11   to 21 United States Code, Section 851 on this basis.  Citing

12   defendant's motion docket No. 329.  In his September 8, 2023

13   submission, the government states that it will move to dismiss

14   Lora's prior felony information in light of, among other

15   things, the Second Circuit's decision in *United States v.*

16   *Minter*, 2023, Westlaw 5730084, Second Circuit, September 6,

17   2023.  Citing the government's brief, docket No. 337 at pages 2

18   and 9.  In *Minter*, the Second Circuit held that, "New York

19   State's definition of cocaine is categorically broader than its

20   federal counterpart."  Citing *Minter* 2023 Westlaw 5730084, *1.

21          Does the government at this point move to dismiss the

22   prior felony information?

23          MR. ROBLES:  Yes, your Honor.

24          THE COURT:  That motion is granted.  The government

25   and Mr. Lora further agree the statutory maximum penalty for

NARILOS

1    the narcotics conspiracy count is 20 years.  Accordingly,

2    Lora's objection is sustained and the prior felony information

3    is dismissed.

4            Finally, Lora argues that the guidelines sentencing

5    range in this case should be 188 to 235 months based upon

6    offense level 36 and Criminal History Category I.  Citing the

7    defendant's objection docket No. 331 at page 6.  For the

8    reasons I have explained, I conclude the base offense level for

9    Counts One and Three is level 43.  Citing the presentence

10   report paragraphs 31 and 36-37.  Because Lora was an organizer

11   or leader of the drug conspiracy that involved five or more

12   participants or was otherwise extensive, four levels are added.

13   That would result in an adjustment offense level of 47.

14   However, pursuant to chapter 5, part A commentary note 2, "an

15   offense level of more than 43 is to be treated as on offense

16   level of 43."  Citing the presentence report paragraph 45.

17   Accordingly, I conclude that Mr. Lora's total offense level is

18   43, I conclude that he falls within Criminal History Category

19   I, offense level 3.  Category I results in a guideline

20   sentencing range of life imprisonment.

21           Mr. Williams, do you have any other objections to the

22   guidelines calculations as I have reported them?

23           MR. WILLIAMS:  No, your Honor.

24           THE COURT:  Does the government have any objections to

25   the guidelines calculations as I have reported them?

1          MR. ROBLES:  No, your Honor.

2          THE COURT:  Based upon my independent evaluation of

3    the sentencing guidelines, I find that the total offense level

4    is 43, the criminal history category is I, and I recommended a

5    sentence of life imprisonment.

6          I will hear from you, Mr. Williams, as to an

7    appropriate sentence.

8          MR. WILLIAMS:  Well, your Honor, you and I have

9    different views of the evidence obviously.  You think that

10   Mr. Lora ordered the murder of Mr. Balcarran.  But leaving that

11   aside, Mr. Lora, while having a number of prior convictions,

12   most of them are for pretty low-level drug offenses, a series

13   of misdemeanors.  The police executed a search warrant at a

14   trailer he was living in at a vacant lot a couple of blocks

15   from the bodega where he worked in 2008.  And they found a

16   small amount of cocaine, I think it was around $1,500 to $2,000

17   in cash, no drug ledgers, no phone lists, no customer lists,

18   nothing like that.  Hardly the profile of a guy that ran a

19   well-oiled drug conspiracy on the corner of 169th and Franklin.

20   But I think more importantly, there is nothing in the record,

21   nothing at all, that Mr. Lora was a violent, assaultive person.

22   All of these arrests, stops, search warrants, no guns, no ammo.

23   None of the government's witnesses at trial describe Mr. Lora

24   as a dangerous person at all.  And it seems almost

25   inconceivable to me -- and I have been doing this job for

NARILOS

1    almost 40 years -- that a person approaching middle age would

2    suddenly go from being a low-level drug dealer making money on

3    the side, never assaulting people, never threatening people

4    would suddenly order what amounted to a drive-by murder in

5    broad daylight a couple of doors down from the bodega where he

6    had worked for years.  It just doesn't make any sense to me.

7    Mr. Balcarran, I would note, and Mr. Lora occupied basically

8    the same space between the late '80s when Dorothy Hendrix told

9    the Court and the jury he was selling drugs out of the bodega

10   in 2002.  Mr. Balcarran got into some trouble with the state

11   and the federal government and, according to those records,

12   Mr. Balcarran occupied an apartment with his mother a couple of

13   doors down from the bodega.  He was released by a court in the

14   Southern District in 1994 or '95, I think, to that apartment.

15   I think it was 1389 Franklin.  There didn't seem to be any

16   trouble between the two of them.  And suddenly, Mr. Lora is

17   going to order the murder when he has been selling drugs in

18   that neighborhood for years with Mr. Balcarran living down the

19   street.  It doesn't make any sense.

20         His experience in prison suggests that he is a

21   hard-working guy.  He has worked -- I forget -- I didn't look

22   at the form that I submitted to the Court.  I know he was

23   working.  I think it was in the cafeteria.  He was taking

24   classes.  He was learning English while I met with him down in

25   the prison in August.  He was -- I talked to him in English.

NARILOS

He seemed to understand it.  He is making progress.  He had a couple of fights in jail, that is it.  Minor fights that would be hard to avoid being in a penitentiary.

          With all that in mind, your Honor, I would ask the Court to cut his sentence in half, equal to Mr. Palmer. According to Mr. Lopez -- and you are aware of this because you saw the same documents I have seen and that the prosecutors knew about -- it was a sixth guy involved in this other than Trujillo and Palmer who gave the guns to Trujillo who was driving the car in which Mr. Lora was riding.  And he may have been the one, according to Lopez at least, who made the call. Mr. Lora didn't see five guys.  He didn't show Caban how to shoot the shotgun.  He wasn't in the car with Caban when Caban shot the shotgun into Mr. Balcarran's chest.  What I find most interesting is when they drove up to Mr. Balcarran, Palmer said he was starting to get out of the car, maybe to talk to Mr. Balcarran, maybe to shoot him with the gun he had.  But, it seems rather unlikely that Palmer would have gotten out of that car knowing the guy sitting behind him, with a loaded shotgun, was going to put himself in his endangerment.  I truly believe that given Mr. Caban's past, unlike Mr. Lora, given Mr. Caban's past, this was more likely than not an impulsive decision that Caban made.  And we would ask the Court to impose a sentence that reflects those facts.  I appreciate the time.  Thank you very much.

NARILOS

1          THE COURT:  Mr. Lora, is there anything you wish to

2    say before the Court imposes sentence?

3          THE DEFENDANT:  Yes, sir.

4          THE COURT:  You can remain seated.  You can remain

5    seated.  And just pull the microphone close so the interpreter

6    can hear what you are saying.

7          THE DEFENDANT:  With all due respect to you, to the

8    Court, to my attorney also and to the interpreters, I swear --

9          MR. MITRE:  I'm sorry, your Honor.  I need to ask for

10   a repetition.  I was not given the opportunity to interpret.

11         THE COURT:  If you could speak in sentences and give a

12   break so that the interpreter can catch up with you, OK?  Go

13   right ahead.

14         THE DEFENDANT:  Excuse me.  What I am going to tell

15   you, it comes from here.  I have never in my life given orders

16   to anyone.  Because I have never had employees.  In fact, I

17   have always been employed since I was 16 years old as the owner

18   of the bodega where I worked.  Asiade Jueva and his brother,

19   Manio Jueva, those people have never sold drugs ever since they

20   came to this country.  And I have always been their employee.

21   So much so that they would give me the keys to the business.

22   That business was worth almost half a million dollars.  Because

23   they trusted me.  And you are not going to trust someone who's

24   doing bad things on the street like this, trust them with your

25   half-million-dollar business.  And if you want, I will give you

NARILOS

1    their phone number you can call them whenever you would like.

2    And that day that it happened, I was working at the bodega that

3    day.  I worked for 16 hours.

4            MR. MITRE:  The interpreter is asking for a

5    clarification.

6            THE DEFENDANT:  Because the employee that was on shift

7    that day then spent the whole night at the bodega because he

8    was stocking.  And so, I was working for hours that day at the

9    bodega and then the police asked me about Palmer and Trujillo.

10           Because I hadn't seen them in four days.  They always

11   used to come by to buy sodas, plantains, eggs, because they had

12   a storefront that they had rented next door to the bodega.

13           At the same business, at the same place where the

14   bodega is, they had a place right next to it, a pool hall.  And

15   the landlord was about to take the business away.  He was

16   taking the business away from them.  And so, it had been two

17   days or three days since the landlord had taken the business

18   away from them because he had realized they were doing

19   something illegal with the place.

20           I have nothing to do with those people.  And I swear

21   to you on my mother's life and my son's life, my family who are

22   back there.  I don't understand any of this.  I never thought I

23   would end up in jail because I was with my family.  I have a

24   ten-year-old daughter.  She just turned ten.  She was just two

25   years old when I was arrested.  And the mother of my children

NARILOS

1    is out there without work because she doesn't have anyone to

2    help her with the kids.  She has six kids.  I want to tell you,

3    six kids.  She has three from me, and three from a prior

4    marriage.

5         So, I don't know how it is that they could accuse me

6    of this if I have nothing to do with those people.  If I had

7    anything to do with those people, I would not have taken my

8    case to trial over something I didn't do.  Because I have

9    nothing to do with those people.  I haven't done anything.

10        THE COURT:  Anything else, Mr. Lora?

11        THE DEFENDANT:  What I would like to do is get out of

12   here to see my father because my mother passed away.  She died

13   in the same month that I was arrested.  My father is a little

14   over 90 years old and I don't know if I will get to see him

15   when I get out of here for something I haven't done.

16        I wouldn't dare tell him how long I was sentenced to

17   so that he don't die because he is diabetic he has a bad heart

18   and all that stuff.  And being in jail for something I haven't

19   done, that is the worst thing that has happened to me in life.

20        THE COURT:  All right.  I will hear from the

21   government.

22        MR. ROBLES:  Thank you, your Honor.  I am happy to

23   answer any questions the Court has.  I know the Court is very

24   familiar with the factual record in this case.  So I will just

25   be very brief.  As we laid out in our submission, the

1   government believes that the sentence that the Court previously

2   imposed for Mr. Lora remains appropriate.  And it is supported

3   by the well-developed factual record both at his trial, and at

4   subsequent proceedings.  It is also in line with the sentences

5   the Court imposed on less culpable co-defendants, all of whom

6   accepted responsibility and all of whom, unlike the defendant,

7   dramatically turned their life around after the events that

8   occurred in 2002.  As your Honor knows, this was an

9   execution-style broad daylight murder and the defendant stood

10  to gain from that as reflected by the fact that he continued to

11  sell drugs on that block for years after the murder.

12          So, with that, your Honor, unless the Court has any

13  questions, the government would rest on its submissions, both

14  the ones that were submitted in 2019, and the ones submitted

15  this year in connection with the resentencing and ask the Court

16  reimpose the same sentence imposed in December of 2019.

17          THE COURT:  In deciding upon appropriate sentence, I

18  have considered all the factors listed in Title 18,

19  United States Code, Section 3553(a) including the nature and

20  circumstances of Mr. Lora's offenses, his personal history and

21  characteristics, the need for the sentence imposed to reflect

22  the seriousness of the offenses, the need to promote respect

23  for the law, to provide just punishment, and to afford adequate

24  deterrence to criminal conduct.  I am also aware when

25  resentencing a defendant after a remand, as at an initial

NARILOS

1    sentence, this Court is required to consider all of the factors

2    set forth in 18 United States Code, Section 3553(a) and make an

3    individualized assessment based upon the facts presented at a

4    sentencing hearing.  Citing *United States v. Weingarten*, 713

5    F.3d 704, at 711, Second Circuit 2013.  "Both at the initial

6    sentencing and on remand, an appropriate sentence is one based

7    upon the totality of the relevant conduct and on the character

8    of the accused." *Id*.  "Where a Court of Appeals has remanded a

9    criminal case for resentencing, a District Court may, in some

10   circumstances, revise upward one component of a sentence after

11   another component was held to have been invalidly imposed."

12   Citing *United States v. Chaklader* 232 F.3d 343 and 346 Sixth

13   Circuit 2000.  "An upward revision of one component of a

14   sentence when another component has been invalidated is

15   permitted only where the revised sentence would be imposed on a

16   count that was the same as or related to the count on which a

17   component of sentence was invalidated and only where the a

18   aggregate sentence was not so severe as to create an undue risk

19   of deterring others from subsequent challenges to sentence

20   components that might be unlawful."  Citing *Chaklader* 232 F.3d

21   337.  See also *Weingarten* 713 F.3d at 716 (concluding that "due

22   process was not violated when the defendant was resentenced to

23   the same aggregate total term of imprisonment after the vacatur

24   of one related count of conviction and the District Court

25   adequately justifies its new sentence.")

NARILOS

1          As to the nature and circumstances of Mr. Lora's

2     offenses, I have discussed the facts of the case, in great

3     detail already.  To summarize, Mr. Lora and his drug crew sold

4     cocaine and crack cocaine for more than 15 years in the

5     vicinity of 169th Street and Franklin Avenue in the Bronx.

6     Mr. Lora's business led him into conflict with a competing drug

7     dealer Andrew Balcarran who sold drugs a block away.

8     Mr. Balcarran threatened and tried to extort Mr. Lora's chief

9     lieutenant, Oscar Palmer, also known as Tito.  As I have said,

10    it is a fair inference from the evidence that Lora decided that

11    Balcarran would have to be killed and that he communicated this

12    to his plot to his subordinates.  One of Lora's workers, Luis

13    Lopez, approached his cousin, Dery Caban, who had recently been

14    released from prison about committing the murder.  Lora

15    supervised the preparations from a distance.  He was in the

16    vicinity when firearms were obtained from another conspirator's

17    home, and he drove around the neighborhood searching for

18    Balcarran on the day of the murder.  When he found Balcarran,

19    who was standing in front of his home, he called his

20    subordinates who were waiting in a second car and reported to

21    them Balcarran's location.  The subordinates and Caban then

22    drove to Balcarran's location, and two of Lora's

23    co-conspirators shot Balcarran to death in cold blood in front

24    of his home in broad daylight with his family inside.  After

25    six months or so, Lora resumed his drug dealing at 169th Street

Franklin Avenue location where he continued to sell drugs over
the next 13 years.

        As to Mr. Lora's personal history and characteristics,
he was born in Santo Domingo in the Dominican Republic.  He is
currently 53 years old.  His parents separated when he was
young.  Mr. Lora and his siblings were raised in poor
socioeconomic conditions, but he was provided with the basic
necessities.  Mr. Lora has never married but he does have three
daughters with two prior partners.  Mr. Lora lived in the
Dominican Republic until 1986.  In that year, he came to the
United States settling eventually in the Bronx.  He is a
permanent resident but currently under removal proceedings.  As
to education, Mr. Lora dropped out of high school.  As to
employment, Mr. Lora claims he was employed at various delis
and bodegas throughout Manhattan and the Bronx since his
immigration in the United States.  He has not been able to
provide any details as to his employment, however.  There is no
significant history of substance abuse.  As to medical
conditions, Mr. Lora suffers from diabetes and from high blood
pressure.  As to criminal record, Mr. Lora has eight prior
convictions, all of which are drug related.  They span the
years between 1991 and 2009.  Given this conviction history as
well as the evidence at trial, it is a fair inference that
Mr. Lora has supported himself through drug trafficking for
most of the many years he has been in this country.  Citing the

1    presentence report, paragraphs 48-55.

2          To summarize, the sentencing guidelines recommend a

3    sentence of life imprisonment.  The probation department, in

4    the December 4, 2019 presentence report, recommends a sentence

5    of 30 years imprisonment on Count Three to be followed by a

6    consecutive term of life imprisonment.  On Count One the

7    government asked me to reimpose an aggregate sentence of 30

8    years imprison.  Mr. Lora requests a sentence of 188 months

9    imprisonment.  With all of this in mind, I will now describe

10   the sentence I intend to impose.  Then I will ask the parties

11   if there is anything further they wish to say.

12          Mr. Lora spent most of his adult life committing

13   crimes.  He consistently sold drugs in his neighborhood over a

14   period of more than 15 years.  Although he was repeatedly

15   arrested and convicted of drug trafficking crimes he never

16   served any jail time.  Ultimately, Mr. Lora's drug business put

17   him in conflict which a competing drug dealer.  And the

18   evidence showed that Mr. Lora decided that that man had to be

19   murdered.  I conclude that a severe sentence must be imposed

20   given the nature of Mr. Lora's crimes, the fact that they

21   involve both murder and drug trafficking and the fact he has

22   committed serious crimes for much of his had adult life.  I do

23   believe that he presents a significant danger to the community

24   having considered all of the circumstances.  I intend to impose

25   an aggregate sentence of 30 years imprisonment.  I conclude

1    that a life sentence is not necessary given that Mr. Lora is 53

2    years old.

3              As to supervised release, although I expect that

4    Mr. Lora will be deported after serving his sentence, in the

5    event that he is not, he will be subject to an aggregate

6    sentence of five years supervised release.  I intend to impose

7    the following mandatory conditions of supervision, Mr. Lora

8    will not commit another federal, state, or local crime.  He

9    will not unlawfully possess a controlled substance.  He will

10   cooperate in the collection of DNA as directed by the probation

11   officer.  He must refrain from any unlawful use of a controlled

12   substance.  He will submit to one drug test within 15 days of

13   release from imprisonment and at least two periodic drug tests

14   thereafter.  I intend to impose the standard conditions of

15   supervised release set forth in the presentence report along

16   with a following special conditions.  The defendant will submit

17   his person and any property residence, vehicle, papers,

18   computer, other electronic communication or data storage device

19   to a search on the grounds that there is a reasonable suspicion

20   that a violation of the conditions of his supervised release

21   may be found.  Failure to submit to a search may be grounds for

22   revocation.  The defendant will warn any other occupants that

23   the premises may be subject to search pursuant to this

24   condition and any search must be conducted at a reasonable time

25   in a manner reasonable manner.  The defendant will obey the

NARILOS

1  immigration laws and comply with the directives of the

2  immigration authorities.  I do not intend to impose a fine

3  because I find Mr. Lora lacks the ability to pay a fine.  I am

4  required to impose a $200 special assessment.

5        Mr. Williams, is there anything further you wish to

6  say?

7        MR. WILLIAMS:  No thank you, your Honor.

8        THE COURT:  Mr. Lora, is there anything further you

9  wish to say?

10        THE DEFENDANT:  Sir, excuse me.  And I'm sorry, but

11  how much is the sentence that I have received?

12        THE COURT:  Yes.  You have received a sentence of 30

13  years that I am about to impose.

14        THE DEFENDANT:  Excuse me, but I think that that is

15  unjust because I have committed no crime and I have not given

16  any order.  And God up above and everyone knows that I have not

17  given any order.  May I be stricken in down now otherwise.  I

18  have never caused anybody any harm, nor will I ever, because my

19  mom did not raise me that way.

20        THE COURT:  Does the government wish to ask anything

21  else?

22        MR. ROBLES:  No, your Honor.

23        THE COURT:  Mr. Lora, for the reasons I have just

24  stated, it is the judgment of this Court you be sentenced to

25  twenty years imprisonment on Count Three and ten years

NARILOS

imprisonment on Count One, with those times to run

consecutively.  You are sentenced to five years supervised

release on Count One and three years supervised release on

Count Three with those terms to run concurrently.  Give me a

moment, please.

          Let me correct that.  You are sentenced to three years

supervised release on Count One.  Sorry.  You are sentenced to

five years supervised release on Count One and three years

supervised release on Count Three with those terms to run

concurrently.  Your terms of supervised release will be subject

to the mandatory standard and special conditions of supervised

release that you just mentioned.  You are also ordered to pay a

special assessment in the amount of $200.

          Are there any open counts?

          MR. ROBLES:  I don't believe so, your Honor.  But to

the extent there are, the government moves to dismiss them.

          THE COURT:  That motion is granted.

          Mr. Williams, do you have any recommendations as to

assignment?

          MR. WILLIAMS:  No, your Honor.  I don't.  He is

currently serving time in a penitentiary in Pennsylvania.  One

of the problems that he has with his classification is that the

Bureau of Prisons believes for some reason -- I tried to

correct it -- that Mr. Lora is currently on probation.  He is

not.  And I don't know whether you can put in to the judgment a

NARILOS

1  line indicating that Mr. Lora is not on state probation here in

2  New York. I submitted the email from -- I think it was the

3  deputy chief probation officer in New York City. You have seen

4  that email.

5      THE COURT: Well, yes. I am familiar with that email.

6  I mean, why can't you submit that email to the Bureau of

7  Prisons officials? Have you done that?

8      MR. WILLIAMS: Yes, I have. It doesn't get through.

9  I don't know why. I don't know whether I have the whole story,

10  whether that is the one thing that keeps him in a penitentiary.

11  Given his criminal history, his lack of escapes, that kind of

12  thing, it seems to me his classification would be much lower

13  than penitentiary which is, as you know, is for the worst of

14  the worst.

15      THE COURT: Well, the problem is that he has the

16  conviction for murder. I mean, I would suspect that that has a

17  lot to do with his classification and prison; right?

18      MR. WILLIAMS: I understand that. It is simply my

19  understanding, from my client, that he has been told that the

20  reason his classification is so high is that the Bureau of

21  Prisons thinks he is on probation and there maybe some other

22  factor I don't know. But if the judgment were to reflect that

23  fact, then maybe something different could happen. If he is

24  qualified, we would ask he be sent to --

25      THE COURT: Sorry. I can't hear you, sir.

NARILOS

1           MR. WILLIAMS:  That he be sent to Otis.

2           THE COURT:  Otisville.

3           MR. WILLIAMS:  Or someplace closer to New York City

4    where his family resides.

5           THE COURT:  Is that your application?

6           MR. WILLIAMS:  Yeah.

7           THE COURT:  I will include a recommendation in the

8    judgment that Mr. Lora be designated -- you said to Otisville?

9           MR. WILLIAMS:  Yeah.

10          THE COURT:  So that he may maintain ties with his

11   family during his remaining period of incarceration.

12          Mr. Lora, I am required to advise you of your appeal

13   rights.  You do have the right to appeal your conviction and

14   the sentence I just imposed.  With few exceptions, any notice

15   of appeal must be filed within 14 days of the judgment being

16   entered in your case.  Judgment will likely be entered on

17   Monday.  Mr. Williams will discuss with you whether or not you

18   wish to file a notice of appeal.  If you are not able to pay

19   the cost of an appeal, you may apply for leave to appeal in

20   *forma pauperis*.  If you request, the Clerk of Court will file a

21   notice of appeal on your behalf.

22          Is there anything else from the government?

23          MR. ROBLES:  No, your Honor.  Thank you.

24          THE COURT:  Anything else for the defense?

25          MR. WILLIAMS:  No, your Honor.

NARILOS

1            THE DEFENDANT:  I want an appeal.

2            THE COURT:  We are adjourned.

3            (Adjourned)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25